32 So.3d 815 (2009)
Robert EVANGELIST
v.
DEPARTMENT OF POLICE.
No. 2008-CA-1375.
Court of Appeal of Louisiana, Fourth Circuit.
September 16, 2009.
Order Granting Rehearing September 25, 2009.
Opinion on Rehearing February 24, 2010.
*817 Eric J. Hessler, Meridian, MS, for Robert Evangelist.
Richard J. Richthofen, Jr., Richthofen & Associates, L.L.C., New Orleans, LA, for Department of Police.
(Court composed of Judge JAMES F. McKAY, III, Judge ROLAND L. BELSOME, Judge PAUL A. BONIN).
PAUL A. BONIN, Judge.
Robert Evangelist, a New Orleans police officer, appealed his termination by the Superintendent of Police, Warren Riley, to the New Orleans Civil Service Commission. The Commission denied his appeal. He filed an appeal in this court from that denial. For the reasons which follow, we reverse and render.

I: FACTUAL BACKGROUND
Mr. Evangelist was a classified employee with permanent status in the New Orleans civil service system. He had been employed as a police officer since March 16, 2003, and was designated as a Police Officer I. On the evening of October 8, 2005, he and his fellow officer Lance Schilling were on foot patrol duty in the French Quarter of New Orleans, on Bourbon Street, near the corner of Conti Street. Two mounted policemen were nearby in the street. A post-Hurricane Katrina curfew remained in effect for the city struggling to return to normal business and activity in the French Quarter and elsewhere, after the storm and flooding.
Robert Davis, a visitor to the city, approached the rear of one of the police horses, a charged conversation between him and the police officers erupted and Davis touched Evangelist's chest. Evangelist and Schilling attempted to subdue and handcuff Davis, who clutched the iron grillwork on a storefront to resist being handcuffed. Two unidentified FBI officers entered the struggle and one of them brought Davis to the sidewalk,[1] causing Davis' head to strike the pavement, sustaining injury. Eventually Davis was restrained and, handcuffed, placed in a EMS ambulance called to the scene to handle the head injury, which had stopped bleeding before the EMT arrived. The EMT evaluated Davis, whom she found to be alert, oriented and awake. Davis was subsequently taken to the temporary site for handling arrestees, the Greyhound Station, for booking.
The encounter occurred about six weeks after Hurricane Katrina. Mr. Davis testified that he was in New Orleans to check on his property. He had ventured from his hotel room near the perimeter of the French Quarter in search of cigarettes. Parts of the encounter between the officers and Mr. Davis were captured on videotape, possibly by more than one source,[2] and were broadcast locally and nationally.
An internal investigation was initiated by the Public Integrity Bureau of the police department. Following the investigation, a departmental hearing was conducted by a deputy superintendent. On December 21, 2005, immediately upon the conclusion of the hearing, Superintendent Riley, the Appointing Authority, issued to Mr. Evangelist a letter of termination, which included other disciplinary actions against Mr. Evangelist and set forth specific *818 charges on which the termination was based.
Mr. Evangelist appealed his termination and the other discipline to the New Orleans Civil Service Commission. A referee assigned by the Commission conducted an evidentiary hearing and issued a report recommending to the Commission that the appeal be granted because the Appointing Authority failed to prove the charges against Mr. Evangelist. The Commission did not conduct any further hearings, but, on August 27, 2008, rendered its decision denying the appeal. It is from that decision that Mr. Evangelist appeals to this court.

II: ADMINISTRATIVE PROCEEDINGS
"No person who has gained permanent status in the classified . . . city service shall be subjected to disciplinary action except for cause expressed in writing." La. Const., art. X, § 8(A); La. Const. art. X, § 1(B). New Orleans police officers are included in the protection guaranteed by this provision. Walters v. Dept. of Police of New Orleans, 454 So.2d 106, 112 (La. 1984).[3] "Legal cause exists whenever an employee's conduct impairs the efficiency of the public service in which the employee is engaged." Cittadino v. Dept. of Police, 558 So.2d 1311, 1315 (La.App. 4th Cir. 1990).
The U.S. Supreme Court considers this type of tenured civil service employment to be a property right which is protected by the Due Process Clause of the U.S. Constitution. The Supreme Court in Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), held:
The essential requirements of due process. . . are notice and an opportunity to respond. . . . The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story.
Further, the Loudermill Court explained: "the point is straightforward: the Due Process Clause provides that certain substantive rights  life, liberty, and property  cannot be deprived except pursuant to constitutionally adequate procedures . . . the right to due process `is conferred not by legislative grace but constitutional guarantee.' [citation omitted]." Id. at 541, 105 S.Ct. 1487.
It is a basic precept of our system of justice, fair play, and due process that one accusedof a crime, an administrative breach of conduct or code violation, or a civil tortbe given notice of that which he or she is alleged to have done or failed to have done. Thus our jurisprudence has required that written notice be given to a public employee. See La. Const. art. X, § 8; Williams v. Dept. of Property Mgmt., 02-1407, p. 2 (La.App. 4 Cir. 4/16/03), 846 So.2d 102, 104; Riggins v. Dept. of Sanitation, 92-1921 (La.App. 4th Cir.1993), 617 So.2d 112. In Webb v. Dept. of Safety & Permits, 543 So.2d 582 (La.App. 4th Cir. 1989), we held that "notice of the charges should fully describe the conduct complained of . . . to enable the employee to fully answer and prepare a defense." More recently, in Williams the City terminated the plaintiff, a city motor vehicle examiner, on the basis of her alleged alteration of her time card for Friday, April 13, 2001. This incident was the only matter discussed at her pre-termination hearing. After the hearing, two other incidents of payroll fraud were discovered, and Williams was terminated. The termination *819 letter listed three separate occasions of payroll fraud. We stated:
Since the Department of Property Management used these other two incidents of payroll fraud to reach its decision to terminate plaintiff's employment, the plaintiff was entitled to notice of these additional charges and an opportunity to present a defense in regards[sic] to these additional charges. The requirements of La. Const. Art. 10 § 8 and Loudermill were not met.
Id. at p. 5, 846 So.2d 102 at 105.
In the case at bar, on the day of the departmental hearing, the Appointing Authority issued a letter sustaining the charges[4] and terminating Mr. Evangelist.[5] The Appointing Authority cannot, as noted above, subject Mr. Evangelist to any disciplinary action "except for cause expressed in writing." La. Const., art. X, § 8(A). The factual basis for the sustained charges was set out in that letter:
. . . on or about October 8, 2005, you were involved in a physical altercation with Mr. Robert Davis. A video of the incident captured you striking Mr. Davis in the torso while he was lying on the ground with three other police officers holding him down.
Mr. Evangelist timely exercised his constitutional right to an appeal from the Appointing Authority's disciplinary action to the New Orleans Civil Service Commission. La. Const., art. X, § 8(A).
The Commission has "the exclusive power and authority to hear and decide all removal and disciplinary cases . . ." La. Const., art. X, § 12(B); Pope v. New Orleans Police Dept., 04-1888 (La.App. 4 Cir. 4/20/05), 903 So.2d 1. Before the Commission, "the burden of proof on appeal, as to the facts, shall be on the appointing authority." La. Const., Art. X, § 8(A) (emphasis added); Walters, supra, at 112-13. "The appointing authority must prove by a preponderance of the evidence the occurrence of the complained of activity and that the conduct impaired the efficient operation of the public service. Newman v. Dept. of Fire, 425 So.2d 753, 754 (La.1983); Cittadino, 558 So.2d at 1315 (La.App. 4 Cir.1990)." Barquet v. Dept. of Welfare, 620 So.2d 501, 505 (La. App. 4th Cir.1993) (emphasis added);[6]Cure v. Dept. of Police, 07-0166, p. 2 (La. App. 4 Cir. 8/1/07), 964 So.2d 1093, 1094, citing Marziale v. Dept. of Police, 06-0459, p. 10 (La.App. 4 Cir. 11/8/06), 944 So.2d 760, 767.
The Commission assigned the appeal to its referee: "[The Commission] may appoint a referee to take testimony, with subpoena power and power to administer oaths to witnesses." La. Const., art. X, § 12(B). After hearing testimony and considering other evidence, the referee issued a written report on February 25, 2008, which concluded: "The Appointing Authority *820 has failed to meet its burden of proof that the Appellant violated any internal rule. Based on the foregoing, the appeal should be granted."
Other than the evidentiary proceeding before its referee, the Commission did not conduct any further evidentiary hearings. On August 27, 2008, the Commission rendered its decision denying the appeal of Mr. Evangelist from the Appointing Authority's termination of him as well as the ten-day suspension for violation of professionalism. Mr. Evangelist then timely appealed to this court.
The Commission's decision is subject to appellate review on any question of law or fact, determining if its order was arbitrary, capricious, or characterized by an abuse of discretion. La. Const. Art. Art., § 12(B); Barquet, 620 So.2d at 505; Cure, 07-0166 at p. 2, 964 So.2d at 1095; Walters, 454 So.2d 106, 114 (La.App. 4th Cir.1984). When there is no rational basis for the Civil Service Commission's action, its decision is arbitrary and capricious. Bannister v. Dept. of Streets, 95-0404, p. 8 (La.1/16/96), 666 So.2d 641, 647.
The judicial review function in a matter appealed from a civil service commission is "multifaceted," Walters, supra at 113-14:
In reviewing the commission's procedural decisions and interpretations of law performs its traditional plenary functions of insuring procedural rectitude and reviewing questions of law. Due concern both for the intention of the constitution and for the boundaries between the functions of the commission and of the court, however, demands that a reviewing court exercise other aspects of its review function with more circumspection. In reviewing the commission's findings of fact, the court should not reverse or modify such a finding unless it is clearly wrong or manifestly erroneous. In judging the commission's exercise of its discretion in determining whether the disciplinary action is based on legal cause and the punishment is commensurate with the infraction, the court should not modify the commission's order unless it is arbitrary, capricious, or characterized by abuse of discretion. R.S. 49:964; Save Ourselves, Inc. v. The La. Environmental Control Comm., 452 So.2d 1152 (La.1984); Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (D.C.Cir.1978); K. Davis, Administrative Law (1982 Supp.) at 536 et seq.
In reviewing the Commission's findings of fact, the appellate court should not reverse or modify a finding unless it is clearly wrong or manifestly erroneous. Walter, 454 So.2d at 113.

III: EVIDENCE BEFORE THE COMMISSION
The only evidence available to the Commission was that adduced before the referee.
A. The written charge, signed by New Orleans Police Department Supt. Warren Riley, the Appointing Authority, was introduced. The violations of departmental rules were set forth in the letter:[7]
RULE 2 MORAL CONDUCT
1. Adherence to Law
Employees shall act in accordance with the constitutions, statutes, ordinances, administrative regulations and the official interpretations thereof, of the United States, the State of Louisiana and the City of New Orleans, but when in another jurisdiction shall obey the applicable laws. Neither ignorance of the law, its *821 interpretations nor failure to be physically arrested and charged shall be regarded as a valid defense against the requirements of this rule.
Applicable Law
17271 MCS 54:96 relative to Battery
(a) It shall be unlawful for any person to commit the crime of battery.
(b) Battery is the intentional use of force or violence upon the person of another; or the intentional administration of a poison or other noxious liquid or substance to another.
RULE 2 MORAL CONDUCT
6. Unauthorized Force
Employees shall not use or direct unjustifiable physical abuse, violence, force or intimidation against any person.
RULE 3 PROFESSIONAL CONDUCT
1. Professionalism
Employees shall conduct themselves in a professional manner with the utmost concern for the dignity of the individual with whom they are interacting. Employees shall not unnecessarily inconvenience or demean any individual or otherwise act in a manner which brings discredit to the employee of the Police Department.
In addition to violations of the departmental rules, the charging letter alleged that Mr. Evangelist's conduct was "contrary to the standards as prescribed by Rule IX, Section 1, paragraph 1.1, of the Rules of the Civil Service Commission of the City of New Orleans."[8]
B. Also introduced into evidence was the New Orleans Police Department Operations Manual, Chapter 1.13, under the Title "Policy on the Use of Force" revised September 13, 1998. The departmental policy provides in part that "[p]olice officers shall use only that force reasonably necessary to effectively bring an incident under control, while protecting the lives of citizens and officers." The policy also treats "the use of deadly force" and "the use of a firearm," neither of which is at issue in this appeal.
C. Photographic images consisted of a single DVD disc with the written inscription on its cover "Evangelist, R. F.Q. Beating Video" introduced as a joint exhibit, and three still photographs, one depicting Mr. Davis standing and two others depicting him on the ground with the four officers present.
D. The referee received the live testimony of Sergeant Howard Gay, Mr. Davis, Superintendent Riley, Sergeant Donald Harris, Mr. Evangelist, and Dr. Wade Schindler. The referee also received, without objection, the transcribed testimony *822 of Ms. Rebecca Calvo and Major Kerry Najolia.[9]

Sgt. Howard Gay, NOPD
Sgt. Gay, the lead PIB investigator, obtained a video[10] from Channel 6, which
. . . shows Officers Evangelist and Schilling affecting [sic] the arrest on Mr. Davis. During that video it shows Officer Evangelist punching Mr. Davis four times to the left side of his head. Also, the video shows that Mr. Davis is taken to the ground at which point he begins to bleed, and he's allowed to stay on the ground, I think approximately four minutes and twenty-two seconds, according to the video, bleeding until EMS arrives on the scene.
The video was the sole factual basis for Sgt. Gay's concluding that Mr. Evangelist was "in violation of department rules."
Sgt. Gay discussed another video:[11] "This one is starting off after the incident is almost over. Right now he is laying[sic] on the ground handcuffed." Sgt. Gay is interpreting a video:[12]
Okay. Again, you see Officer Schilling punching Mr. Davis . . . The guy with the black shirt on is an FBI agent. The other guy with . . . the cap on . . . That's Officer Evangelist. And you can see he kneed him a couple of times and then punched him right there while he was on the ground. . . . And he's going to punch him again . . . that's pretty much the extent of it.
Responding to a question from the referee, Sgt. Gay testified that there was no relevant evidence "other than the tape itself" on which he relied to conclude that Mr. Evangelist used unauthorized force.
The referee also asked Sgt. Gay if it was appropriate "to use his knee to force his arm behind his back?" to which Gay replied, "If that was what he was doing and that needed to be done at that point, yeah." Also, in response to the referee, who was apparently relating the evidence to the written charge, Sgt. Gay stated that if Mr. Evangelist punched the suspect on the side of the torso to force the person to react in order to reposition the suspect's arm, such would be "absolutely" acceptable use of force.
Sgt. Gay was the only investigator[13] who testified before the referee. He described leading a joint investigation of the incident with other NOPD sergeants and "some members of the FBI." Notably, the two FBI agents involved in subduing Mr. Davis did not testify before the referee. The FBI agents "never made themselves available for an interview. In fact, they left town the next day."[14] Sgt. Gay prepared a single report which was used for the criminal charges against Mr. Evangelist and the PIB investigation; he was not *823 present at the department hearing in that investigation.

Mr. Davis
Mr. Davis remembers only being struck on the side of the face while he was standing next to a wall. There is no dispute that it was not Mr. Evangelist who struck Mr. Davis while he was standing, and the portion of the incident recalled by Mr. Davis does not form any basis of the charges against Mr. Evangelist. Also, there is no question that Mr. Davis' bleeding was not caused by the unauthorized use of force. Sgt. Gay agreed that Davis only began to bleed after he was "taken to the ground" as a result of a maneuver performed by one of the FBI agents, who intervened to assist in the arrest, and not by any action on the part of Mr. Evangelist. The force used by the FBI agents, according to Superintendent Riley, did not constitute "unreasonable force."
Mr. Davis claimed that after he was brought to the ground he became and remained unconscious, and provided no resistance. Rebecca Calvo, an emergency medical technician called to the scene, stated that because Mr. Davis had stopped bleeding by the time she arrived at the scene she did not need to apply any bandage. She also testified Mr. Davis was awake, alert and oriented when she administered standard tests to him. Mr. Davis was cross-examined, revealing a disparity between his testimony at the criminal trial and his account of events at the hearing.
At the hearing the referee observed Mr. Davis and described in detail the "hostile and bizarre" manner in which he responded to questions. The referee concluded that Mr. Davis was "play acting in an attempt to conceal his true personality. Further, Mr. Davis' version of events was not credible." He cited the conflicts in testimony between Mr. Davis' and others' accounts of the incident. Indeed, Mr. Davis testified that he did not know whether Evangelist struck him because he (Davis) lost consciousness.[15]

Sgt. Donald Harris, NOPD
Sgt. Donald Harris, an instructor in the use of force at the NOPD training academy, testified regarding the training of officers in the use of force to restrain adversaries as well as how recruits are taught to respond to resistance.[16] He testified that a handcuff on one hand poses a danger to a police officer if the subject uses it as a weapon. He testified that Mr. Evangelist acted within the force continuum if he punched Davis in the torso to force compliance and to handcuff Davis' other hand. Sgt. Harris described shoulders, arms and legs as appropriate areas for a strike with hard hands. According to Sgt. Harris, strikes to those areas are calculated to get the subject's arms to relax to facilitate compliance with a police officer's attempt to handcuff."[17]
Sgt. Harris viewed one of the videos[18] and stated:
That was Officer Evangelist to the back  his back was to me throwing punches. It looked to me like head strikes. However, there is a technique that we teach, again with the closed fist, for the muscle to relax on the back of the  sort of the shoulder blade that we teach, a strike to part of the whole *824 what's called the brachial plexus tie-in to weaken the arm so that the officer can bring it to  take it to the back and handcuff the person.
And later he stated:
Then if they [the blows] were to the back, I mean, it looked likeI mean, that's what it looked like to me. But we would teach that there was a blow that an officer could strike to the back, again around the shoulder blade area."
If it were concluded that the blow was to the back or around the shoulder blade, Sgt. Harris testified that such a blow would be "acceptable." Further, he testified that from his review of the video, when Davis was positioned on the pavement no strikes were thrown at him.

Supt. Warren Riley, NOPD
Supt. Riley described viewing several videos, one of which was supplied to him by CNN which had audio.[19] He also described watching one video "many times." He viewed a video before and after the internal investigation. His decision to terminate Mr. Evangelist was "based upon video evidence that I observed, as well as an investigation by the New Orleans Police Department, as well as from an official hearing that was conducted by then-Operations Chief Steven Nicholas, and upon my review of that information . . ." Supt. Riley did not view any video during the proceeding before the referee, nor did he identify any video which is in evidence in this court.

Mr. Evangelist
Mr. Evangelist testified that Mr. Davis was possibly inebriated and was initially hostile at the scene of the incident, cursing him and striking his upper chest when he tried to remove Mr. Davis from where he stood close to the rear of a police horse in the street. Mr. Evangelist struck Mr. Davis' shoulder four times; finally, after intervention of two FBI officers and Officer Schilling, Mr. Davis was brought to the ground and handcuffed. Mr. Evangelist believed he followed his training in seeking to make Davis comply, to determine he had no weapons and was not in a position to take the police officers' weapons. He stated: "I never struck him in the head or in any place that I shouldn't have or wasn't trained to have struck him." Mr. Evangelist tried to hit Mr. Davis in the neck, on the side, to perform the brachial plexus tie-in release maneuver described in the earlier testimony of Sgt. Harris as an approved and effective use of force.

Dr. Wade Schindler
Dr. Wade Schindler testified as an expert in the proper use of force by a police officer. He viewed a video tape,[20] read witness statements, interviewed Mr. Evangelist, and read NOPD rules regarding force. He stated,
What I observed, and in also talking to Officer Evangelist what I observed was about five minutes of a struggle. It's very, very unusual for police to be involved in a struggle like that over that length of time. There's always this interaction between the person to be arrested and the officers. Usually, that *825 takes place within a few seconds or maybe a little bit more and then it's over, there's compliance.
What I saw here was about five minutes of non-compliance. I saw four police officers, two federal, two local, attempting to get compliance. And at no time, until the very end, were they able to get Mr. Davis to comply with the request. . . . I did not see any voluntary compliance.
Dr. Schindler expressed his opinion that Mr. Evangelist acted appropriately in conformity with his training and NOPD rules on use of force. The blows to Mr. Davis' torso were appropriate and calculated to make him comply with handcuffing. Striking an arrestee in the area "below the earlobe and down to the bottom of the neck . . . is authorized under the training that they had." When asked, "Were any of the blows that you saw Officer Evangelist administer improper or inconsistent with his training?" Dr. Schindler replied, "No." "He did it exactly as it is taught."

Maj. Kerry Najolia
Major Kerry Najolia, Director of Training at the Jefferson Parish Sheriff's Office Training Academy and a certified POST instructor and expert in "force continuum" (the protocol or escalation of methods and devices to subdue opponents with appropriate forcefrom a wave-over to a taser) testified on behalf of Evangelist.[21] Major Najolia's expert opinion was that Mr. Evangelist acted within protocols for subduing a noncompliant adversary. "Clearly my belief in watching the video is that Officer Evangelist . . . clearly had sufficient cause to escalate more quickly than he did in this situation." Major Najolia stated:
[P]olice officers are absolutely trained that they can punch, kick, elbow, knee to the entire body area. . . . And, basically what Officer Evangelist and Officer Shilling utilized was techniques that were directed to soft tissue areas. Areas that were on the lower level in the lower region of the target zones.
He considered a kick prior to Mr. Davis' being handcuffed to be appropriate: "[U]ntil those hands are placed behind his back and the handcuffs are secured, then clearly there is a tremendous danger and risk to the officer's safety and the other innocent people in that area." When asked "Did you see any force employed by Mr. Evangelist after the threat had been neutralized or after Mr. Evangelist had him under control in the handcuffs?" Major Najolia replied,
There was a touching of . . . Mr. Davis' shoulder area on a couple of occasions, and it could be two or three times when it appeared that Mr. Davis was, in fact, attempting to sit up. It appeared to me, and based on what Officer Evangelist told me, he was just . . . basically just trying to keep Mr. Davis in a position where he would no longer be a significant danger or in a position where he could injure himself.
Asked if these actions were appropriate, Major Najolia replied, "Certainly," stating:
Once Mr. Davis is walking and placed against the wall, clearly it was evident to me that both Officer Evangelist and Officer Schilling were doing everything that they possibly could to get Mr. Davis' hands behind his back so that they could apply handcuffs. Based on the fact that they could not get those hands behind his back, it was because of his resistance and aggressive movements *826 away to prevent them from putting his hands behind his back, so that clearly is resistance in my opinion and aggression.

Images of the Incident
The DVD disc introduced as a joint exhibit is the only video in evidence in this court, and it does not contain any audio.[22] Moreover, the only part of the encounter captured on this single video does not pertain to the written charges against Mr. Evangelist; Mr. Davis is standing beside the grillwork on the front of a building, and the only officers depicted are Mr. Evangelist and Mr. Schilling. The written charge described "[a] video of the incident [which] captured you striking Mr. Davis in the torso while he was lying on the ground with three other police officers holding him down."
Three still photographs were introduced in evidence, two of which show Mr. Davis with four police officers (two FBI agents among them), one of which shows Mr. Davis standing.
After he heard live testimony, viewed images including those depictions, and reviewed the trial transcript testimony entered in evidence at the hearing, in his report to the Commission, the referee observed of a video, "[I]t's difficult to tell from that angle" where blows to Mr. Davis landed. He stated:
Well, I don't think the issue is where the blows landed, because it has already been determined that the blows were not to the head. I mean, the disciplinary letter says it was to the torso. Granted, it's difficult to tell from that angle, but that's what the conclusion was.
Nevertheless, mindful of the NOPD's charges against Mr. Evangelist, the referee concluded: "Based upon the overwhelming evidence the Appellant reasonably complied with the use of force continuum" and "the Appointing Authority has failed to meet the burden of proof that the Appellant violated any internal rule."

IV: THE COMMISSION'S DECISION
Although the referee reported and recommended to the Commission that Mr. Evangelist's appeal should be granted,[23] the Commission denied the appeal, basing its decision largely on its evaluation of "a videotape":
Important evidence in this case is a videotape of the incident taken by a pedestrian *827 on Bourbon Street. . . . A portion of the videotape, agreed to by all counsel, was introduced into evidence. It provides a more accurate account of the incident than the simplistic versions testified to by Mr. Davis and [Mr. Evangelist], both of which we take with a grain of salt. To this observer the videotape shows . . . Mr. Davis is seen on the pavement facing upwards with [Mr. Evangelist] crouching beside him. [Mr. Evangelist] strikes Mr. Davis at least twice in his head area at a time when Mr. Davis appears immobilized and offering little resistance.
(emphasis in original).
The videotape described in the Commission's decision was not precisely identified during the hearing or in the decision and is not in evidence in this court.
A fair reading of the Commission's decision compels the conclusion that its view of the facts was inextricably bound to a videotape which is not in evidence.[24] In order to perform our judicial review function, we must extricate from its decision those questions of fact which the Commission resolved solely upon its review of this video tape. Because there is no video in evidence pertinent to the written charges, we must consider without the benefit of a video whether the facts which the Commission found are not clearly wrong.
We consider two exhibits as crucial in determining whether the Commission followed administrative procedure and provided basic due process to Officer Evangelist: first, the termination letter from Supt. Riley charging Officer Evangelist with specific acts of battery: blows to the torso of Mr. Robert Davis; and, second, visual images in evidence, consisting of a snippet of videotape and three photographs purporting to capture the encounter which undisputedly involved Davis, Evangelist, his partner Schilling, and two unidentified FBI agents, complicated by the foreground of the videotape scene's being obscured or blocked by the flanks of a horse, presumably one of the police mounts which engaged Davis' interest at the outset of the episode.

The Threshold Issue, Which the Commission Addressed Only Indirectly in Its Decision, Is The Lawfulness of the Detention and Arrest of Mr. Davis.
Before addressing the exhibits, we must first address a threshold issue, one which we deem a gateway to the rest of the case. The Commission's decision suggests that Mr. Davis resisted an unlawful arrest so that any use of force, reasonable or unreasonable, would not have been justified. It stated, "There is no evidence in the record that Mr. Davis was breaking any law, a suspect for any crime, disturbing the peace or threatening anyone. There is no evidence that he had been drinking . . . the possibility that he was carrying a concealed weapon was minimal." However, the Appointing Authority, whose investigation generated the charges, did not accuse Mr. Evangelist of unlawful arrest. When it had the opportunity to bring charges  and it was not reluctant to assign several charges based on the incident  both in criminal proceedings and in departmental investigations, it at no time listed "unlawful arrest" of Mr. Davis among them.
La. R.S. 14:108 makes it unlawful to resist a police officer when the person knows that the police officer, in his official capacity, is arresting him.[25] Further, La. C. Cr. P. Art. 220 provides:
A person shall submit peaceably to a lawful arrest. The person making a *828 lawful arrest may use reasonable force to effect the arrest and detention, and also to overcome any resistance or threatened resistance of the person being arrested or detained.
Mr. Evangelist was in uniform and Mr. Davis knew he was a police officer. He was not entitled to resist, and Mr. Evangelist was entitled to use "reasonable force" to effect Mr. Davis' arrest. Sgt. Gay, who conducted the internal investigation on behalf of the NOPD, acknowledged that Mr. Davis was resisting the four officers trying to handcuff him, and that Mr. Evangelist was authorized to use force to accomplish a lawful arrest. The NOPD Operations Manual, Chapter 1.13, "Policy on the Use of Force," set forth the applicable standard: "Police Officers shall use only that force reasonably necessary to effectively bring an incident under control, while protecting the lives of citizens and officers." Police instructors Najolia and Schindler both considered the detention to be lawful and use of force to be appropriate based on the noncompliance of Mr. Davis in his resistance to being handcuffed.
The Commission's finding as an underlying fact that Mr. Davis' arrest was unlawful is manifestly erroneous. No reasonable factfinder could conclude that Mr. Davis' arrest was unlawful, especially in the light that the Appointing Authority never made any such charge nor even tried to prove such a charge.

The Commission Erroneously Based Its Decision on Alleged Blows to Mr. Davis' Head, Not the Charged Activity: Blows to His Torso.
The chief factual dispute is whether Mr. Evangelist hit Mr. Davis on the head/ in the head area, or whether he hit him in the torso. The Commission's decision describes the videotape as showing that Evangelist struck Davis "about the head." The decision states that "[a]ppellant swung at Mr. Davis' neck, while he was [facing the wall] . . . and `missed' and struck him in his arm with a baton. . . . Appellant strikes Mr. Davis at least twice in his head area." The Commission disregards the witnesses' testimony in favor of its view of the video. For example, the Commission wrote that "[c]ontrary to the assumption made by Mr. Najolia, [Mr. Evangelist] and Officer Schilling were not striking `soft tissue' areas of the lower body." The decision does not support the precise charges set forth in the NOPD letterblows to the torso. Also, the decision is also contrary to the referee's findings.

Expert and Police Witnesses Concurred That Blows to the Torso are Acceptable and Are Part of Techniques of Use-of-Force Restraint Taught to Police Officers.
All the witnesses who testified regarding police training on the use-of-force continuumMajor Najolia, Dr. Schindler, Sgt. Harris, and Mr. Evangelist, agreed that blows to the torso are among accepted maneuvers to obtain compliance, and are not unauthorized force. For instance, a blow to the shoulder area, the brachialplexus tie-in muscle zone is to effect the hand's release of a grip or a weapon. No witness testified that blows to the torso area were not appropriate, and witnesses who did testify on that issue agreed that individual circumstances vary, and the criterion is necessary force to obtain compliance. Thus the charges of the Appointing Authority are inherently erroneous and *829 cannot support the termination of Mr. Evangelist.

The Decision Erroneously Rejected Evidence of Mr. Davis' Lack of Credibility and of Mr. Evangelist's Truthfulness.
We note the contradiction in the Commission's decision, which dismisses the testimony of Mr. Evangelist, "taking it with a grain of salt," yet not sustaining the Appointing Authority's charge of untruthfulness. Sgt. Gay admitted that he considered Mr. Evangelist to be truthful and did not investigate a truthfulness violation charged against Mr. Evangelist. He testified that the investigation found only that Mr. Evangelist violated rules regarding adherence to law, professionalism, moral conduct (which is unauthorized force), and battery on Robert Davis.[26] Sgt. Gay found "no violation of police department regulations requiring truthfulness."[27]
The referee found that "the appellant's [i.e., Evangelist's] testimony was consistent with what was viewed in the video evidence." On the other hand, the referee found Mr. Davis unreliable, stating in his report: "Mr. Davis was not a credible witness."
Mindful of the specific NOPD charges against Mr. Evangelist, the referee concluded: "The Appointing Authority has failed to meet the burden of proof that the Appellant violated any internal rule" and, "[b]ased upon the overwhelming evidence, the Appellant reasonably complied with the use of force continuum."
The Commission found facts not supported by the video in evidence, and its decision attributed to Robert Evangelist different batteries on Mr. Davis than the batteries specified by Supt. Riley's charges against him. As such, the decision's disparity is violative of the due process requirement for precise notice. The Commission had to find "blows in the torso" as charged in the NOPD letter. However, it did not do so. The Commission decision stated:
The videotape shows that at the time Appellant struck Mr. Davis four times, two of which were in his head area while he was lying on the pavement, he was physically restrained by four police officers and there was no necessity to take such violent action particularly since Mr. Davis offered to voluntarily turn over for the purpose of permitting the handcuffs to be attached. (emphasis added).
We do not know what the commission viewed, for it failed to take steps to ascertain that the video on which it relied so heavily was made part of the record for our review. The evidence we have reviewed shows Mr. Davis resisting restraint and handcuffing. The Appointing Authority had the burden to preserve the evidence and introduce it into the record. The transcript, however, does not reveal a proper and precise identification of additional visual images besides the three still photographs and the single DVD disc referenced above, and does not contain any identification of any audio recording.

The Sounds of Silence: Numerous Missing Pieces of Evidence
We are confronted with gaping holes, lacunae in the evidence, yet the Appointing *830 Authority bears the burden of proof. "The unexplained failure of a party to call a witness who possesses peculiar knowledge of material facts pertinent to the resolution of the case entitles the opposing party to a presumption that the witness's testimony would be unfavorable." Arnone v. Anzalone, 481 So.2d 1047, 1050 (La.App. 1st Cir.1985). "It is well established that such a presumption is available in this state [citations omitted]." Morgan v. Matlack, 366 So.2d 1071, 1073 (La.App. 1st Cir. 1979), writ denied 369 So.2d 1352 (La. 1979); Tillman v. Canal Ins. Co., 305 So.2d 602, 606 (La.App. 1st Cir.1974), reh. den. (1974), writ ref'd. (1975); Lavigne v. Oechsner, 519 So.2d 870, 871 (La.App. 4th Cir.1988); Smith v. Dept. of Public Safety & Corrections, Hdqtrs., 500 So.2d 779, 780-81 (La.App. 1st Cir.1986), reh. den. (1987). The First Circuit in Ryder v. DHHR, 400 So.2d 1123, 1126 (La.App. 1st Cir.1981), wherein the appellate court reviewed the decision of the state civil service commission terminating a classified civil servant, reversed, holding the commission's decision to be manifestly erroneous. The Ryder Court stated:
It should . . . be noted that, in discharging its burden of proof, the authority failed to call three other witnesses who were present at this incident. Because their testimony would logically be part of the authority's case, and their failure to testify being unexplained, it must be presumed that their testimony would not have aided the authority's case.
Id.

The Appointing Authority Failed to Call the Two FBI Agents and/or Investigators.
Sgt. Gay in his testimony at the hearing told the hearing officer that he, together with three other NOPD sergeants and two FBI personnel, investigated the incident. Descriptions of the incident by Mr. Evangelist and Sgt. Gay state that two FBI agents interposed themselves into the incident and in fact one FBI agent brought Mr. Davis to the ground, causing him to strike his head on the sidewalk (the sole cause of his head injury). When questioned at the hearing, Sgt. Gay testified, "The FBI agents never made themselves available for an interview. . . . They left. They left the next day. They were gone. . . So I never got a chance to . . ." He stated that the agents used acceptable force to bring Davis to the ground. Supt. Riley also testified that the force used by the FBI agents to attempt to control Mr. Davis was appropriate. The record is devoid of evidence from these two eyewitnesses/ participants in the incident. Moreover, the Appointing Authority did not call as witnesses several law enforcement officers, both local and FBI, with whom it had cooperated in its investigation, raising the inference that their testimony would support Mr. Evangelist, not the Appointing Authority.

The Appointing Authority Failed to Call the NOPD Mounted Officer(s) at the Incident.
The snippet of film submitted in the record before this court shows one horse and its NOPD rider prominently in the foreground of the incident. Officer Evangelist testified and Sgt. Gay testified (as to his investigation) at the hearing that Mr. Davis was seen at a NOPD horse's rear appearing to touch or contact the horse, causing the officers to move him out of the street, away from the horse and then to engage in the contretemps. The name of the equestrian officer and a statement of that officer regarding the incident are *831 absent from the record. If indeed there was a second mounted officer at the scene, the name and/or report or information regarding that mounted NOPD officer is also missing from the Appointing Authority's record.

The Appointing Authority Failed to Call NOPD Officer Smith and Cameraman Matthews.
The record fails to include a statement or even the identity of the person who made the video, hence perforce witnessed the incident. A "cameraman" called "Matthews" is mentioned in the testimony but not identified; and no statement from this apparent eyewitness was made part of the record. The transcript shows that an NOPD Officer Smith was also involved, but the Appointing Authority's investigation and evidence provides no information regarding him or testimony from Officer Smith regarding the incident, which produced a complaint against him. This additional source of eyewitness testimony would have been relevant to the charges against Mr. Evangelist.

The Appointing Authority Failed to Identify and Include in the Record One or More Videotape(s) With Audio Component.
The most significant lacuna in the record is the absence of a depiction (or possibly more than one) of the incident that is longer and contains more detailthe video or tape to which counsel refer in the hearing, but fail to include in the evidence that was part of the record filed in this court. And a depiction with audio, referred to by witnesses and the attorneys, is part of that hole in the evidence. Because the burden of proof lies with the Appointing Authority, it should have taken care to make a complete record for the purposes of appellate review. The Commission should have examined only the evidence introduced and addressed the vexing lacunae therein in deciding whether the Appointing Authority carried its burden of proving the charges against Mr. Evangelist.

The Appointing Authority Omitted Evidence of the PIB Investigation of Officer Schilling and Officer Smith, Who Were Subjects of Complaints and/or Were Charged with Violations by the NOPD for This Incident.
Without the videotape in evidence to support the Commission's factual findings, we are compelled to disregard its ruling as having been made based on material not in evidence. Therefore, we make an independent assessment of the evidence to determine if the record before us substantiates the Commission's finding, in essence, that Mr. Davis resisted an unlawful arrest and that Robert Evangelist struck four blows to Mr. Davis' torso, as charged by the Appointing Authority. Our review of the record, including the single videotape (DVD disc) placed in evidence, brings us to the inevitable and overwhelming conclusion that the Commission committed manifest error in evaluating the Evangelist incident, and in finding that the Appointing Authority proved by a preponderance of the evidence that the complained of activity or dereliction by Officer Evangelist occurred. See Cittadino, 558 So.2d at 1315 (La.App. 4 Cir.1990).

V: SUMMARY OF DISCUSSION
In exercising our multi-faceted review function under Walters, we first conclude that the Commission's review of a video or videos which were not placed into evidence and upon which it then largely based its decision is not allowed. In performing our traditional plenary function of insuring procedural rectitude, we disregard the Commission's findings to the extent that they rely solely upon the impermissible viewing of such non-evidence.
*832 We next review the evidence that is in the record and, from our review of the entirety of the record, conclude that the Commission's findings of fact that Mr. Davis was resisting an unlawful arrest or, stated another way, that Mr. Evangelist was effecting an unlawful arrest, is manifestly erroneous or clearly wrong. We conclude that the Commission's finding that Mr. Davis was struck by Mr. Evangelist not in the torso, as charged, but in the head area, is also manifestly erroneous. We, therefore, conclude from the evidence in the record before us that Mr. Evangelist was effecting a lawful arrest of Mr. Davis and that in effecting the arrest he did not strike Mr. Davis in the head area after he was on the ground.
Although the Appointing Authority did prove by a preponderance of the evidence that Mr. Evangelist struck "Mr. Davis in the torso while he was lying on the ground with three other police officers holding him down," we further conclude from the totality of the evidence that such force does not constitute "unauthorized force" under the circumstances.
Finally we conclude that there is no rational basis for the Commission's determination that there was legal cause for Mr. Evangelist's removal from the civil service as well as the related discipline. Therefore, the Commission's decision is arbitrary and capricious and it must be modified.

DECREE
For the reasons set forth above, we reverse the ruling of the New Orleans Civil Service Commission. Robert Evangelist is to be restored to his New Orleans Police Department rank as of October 8, 2005, and all benefits, seniority standing, and salary are to be reinstated as of that date.
REVERSED AND RENDERED.
McKAY, J., concurs.
BELSOME, J., dissents with reasons.
MCKAY, J., concurs.
Although I do not agree with the reasons put forward by Judge Bonin, based on the record (or lack thereof) before this Court, I also find that the decision of the Civil Service Commission was arbitrary and capricious. Therefore, I also would reverse.
BELSOME, J. dissents with reasons.
As the majority acknowledges, this incident occurred approximately one month after Hurricane Katrina struck. Although New Orleans was returning to its normal business activities, it nonetheless remained a major metropolitan area in a post-industrial United States, not a hotbed of anarchy and mayhem. Our judgment should not be swayed by the challenges that faced public and private citizens alike during that time, but must rather be based upon the applicable law and procedure.
In this case, we are presented with a disturbing set of facts. A 64-year-old man was placed under arrest by four or more police officers and FBI agents. From all accounts, the arrest was recorded on a video that was broadcast on both CNN and WDSU. Testimony from no less than five witnesses described the altercation or beating, depending on the perspective, that took place during the arrest. Unfortunately, the video that was referenced by the officers and experts who testified at the December 6, 2007 hearing is not the tape in evidence with this Court.[1] What happened to the original footage is *833 unknown. The Commission indisputably viewed the original recording in its entirety, based upon their detailed description of its contents and resulting decision. Whether there was an inadvertent mistake in transmitting the evidence to this Court or whether something more sinister occurred will never be known. What is known is that the Fourth Circuit Clerk of Court's record evidences that the record and exhibits, including the video recording, was checked out by one of the parties on December 8, 2008, and returned on December 22, 2008. It is not known what video recording was in evidence with this Court prior to the record checkout, as the exhibits and record had not yet been reviewed by the Court at that time.
Civil Service Rules have been promulgated to protect workers from unwarranted punishment or retribution by their employer. See Marziale v. Department of Police, p. 13, XXXX-XXXX (La.App. 4 Cir. 11/8/06), 944 So.2d 760, 768. Consequently, the requirements to discipline an employee are defined within the Civil Service's departmental rules. Reviewing courts should not overturn a Civil Service Commission's factual findings absent a rational basis to justify the Commission's determinations. Walters v. Dept. of Police of New Orleans, 454 So.2d 106, 112 (La. 1984).
"[A]s in other civil matters, deference will be given to the factual conclusions of the [Civil Service] Commission." Bannister v. Dept. of Streets, 95-0404 (La.1/16/96), 666 So.2d 641, 647. Accordingly, the appellate court should not reverse or modify such factual findings unless they are clearly wrong or manifestly erroneous. Walters, 454 So.2d at 112. "In judging the Commission's exercise of its discretion in determining whether the disciplinary action is based on legal cause and the punishment is commensurate with the infraction, the [appellate] court should not modify the commission's order unless it is arbitrary, capricious or characterized by abuse of discretion." Id. A determination by the Commission is "arbitrary and capricious" if there is an absence of a rational basis for the action taken. Bannister, 666 So.2d at 647.
This writer does not find that the record evidences that the Civil Service Commission's factual findings were manifestly erroneous or clearly wrong. Nor does a review of the record in its entirety reveal that the Commission's determinations regarding the disciplinary action lacked a rational basis. Therefore, this writer differs from the majority's conclusion that the Commission's determinations were arbitrary and/or capricious.
The Civil Service Commission's description of the events contained in the video recording viewed in connection with its decision is as follows:
Important evidence in this case is a videotape of the incident taken by a pedestrian on Bourbon Street. The videotape has received local and national media attention. Reactions vary widely. A portion of the videotape, agreed to by all counsel, was introduced into evidence. It provides a more accurate account of the incident than the simplistic versions testified to by Mr. Davis and Appellant, both of which we take with a grain of salt.
To this observer the videotape shows Mr. Davis receiving several severe blows to the head area by Officer Schilling while Mr. Davis is standing and facing a wall. He does not appear in the videotape to be a threat to the officers as he faces the wall. Appellant swung at Mr. Davis' neck while he was in this position and "missed" and struck him in his arm with a baton.

*834 Thereafter Mr. Davis is seen on the pavement facing upwards with Appellant crouching beside him. Appellant strikes Mr. Davis at least twice in his head area[2] at a time when Mr. Davis appears immobilized and offering little resistance. Unfortunately, part of the videotape is obscured by a horse which is being moved by its rider (a policeman) in front of the camera. After the handcuffs are attached and the officers cease contact with Mr. Davis, he lies on the pavement barely moving.
While this incident was being filmed an unidentified pedestrian at the scene is heard on the videotape to say"Did you get that on filmhe surrendered and then they hit him on the head and that's when he turned around and started fighting . . ."[3]
In this case, the Civil Service Commission found that the Appointing Authority had good and lawful cause for taking disciplinary action. The Commission reviewed the testimony and evidence presented at the hearing in making its determinations, most notably that of Appellant, who testified that he struck Mr. Davis four times while he was lying on the ground and admitted attempting to strike Mr. Davis in the neck while he was standing against the wall. The Commission also reviewed the testimony of the EMT, Rebecca Calvo, who observed that Mr. Davis had a contusion with laceration[4] to his right eyebrow and a contusion on his entire left eye. Ms. Calvo further testified that Mr. Davis' face was so swollen with cuts and lacerations that she could not examine his pupils, and that Mr. Davis advised her that he could not open his eyes because it was too painful.
Sgt. Howard Gay of the Public Integrity Bureau also testified. The Commission reviewed his testimony regarding his investigation of the complaint filed against Appellant and his sustaining of charges against Appellant for violations of adherence to law relative to a battery, lack of professionalism and lack of moral conduct. Sgt. Gay viewed a videotape[5] not in evidence with this Court, which he testified as showing Appellant punching Mr. Davis in the head area and bracing Mr. Davis with his knee while on the ground and surrounded by four police officers. Sgt. Gay further testified that the video evidenced Mr. Davis being taken to the ground, at which time he began to bleed. Sgt. Gay stated that Mr. Davis was allowed to stay on the ground, bleeding, for four minutes and twenty-two seconds, until EMS arrived on the scene. Sgt. Gay testified that *835 "[t]hose particular actions, in my estimation, did not concur with the training received at the Police Department, which indicated to me that they were in violation of department rules."
The Commission also reviewed testimony from Police Superintendent Warren Riley, who determined that it was necessary to discipline Appellant for violating the proper procedures for applying physical force to restrain or defend against uncooperative or dangerous persons. Supt. Riley testified that he made his determination after viewing a videotape[6] of the incident, reviewing Sgt. Gay's investigation report, and participating in an official hearing with Operations Chief Officer Steven Nicholas.
Sgt. Donald Harris, the eight-year NOPD training instructor, also testified regarding the force continuum. The Commission noted the levels of the force continuum, beginning with oral directives and progressing to "soft hands," which he described as an officer using an open hand to direct the individual where to go. Only if the "soft hands" approach is ineffective is limited physical force appropriate, also termed "hard hands." According to Sgt. Harris, "hard hands" involves the striking of body parts such as shoulders, arms and legs. Specifically, he testified that continuous strikes to the radial muscle on the arm will cause a person's hand to relax so that the officer may handcuff the individual. Even in situations where "hard hands" are appropriate, Sgt. Harris testified that it is not appropriate to strike an individual in the head area. Sgt. Harris further testified that, from viewing the videotape, Appellant appeared to have struck Mr. Davis inappropriately about the head with "two head blows."
After reviewing all of the evidence and the aforementioned video recording of the incident, the Commission concluded that the Appointing Authority established a basis for disciplining Appellant for battery, unauthorized use of force and lack of professionalism by a preponderance of the evidence. The Commission further found that Appellant and his partner initiated the incident by intervening in a conversation Mr. Davis started with the mounted police officer, and that Mr. Davis' overreaction to this intervention did not by itself justify Appellant's actions of forcibly bracing Mr. Davis against a wall and striking him in the head area while lying on the pavement. Even with resistance, the Commission determined, Mr. Davis was not a serious threat to the safety of the four officers using force on him. Accordingly, the Commission concluded that Appellant used excessive force.
Considering this evidence in conjunction with the description of the events on the video viewed by the Commission, this writer cannot agree that the Commission's decision lacks a rational basis. Although a wholly different version of the video was placed in evidence before this Court, it does not follow that the Commission's determinations are without rational basis simply because the Commission and, notably, the witnesses who testified on behalf of both Appellant and the Department of Police, viewed an alternate version of the video recording of the incident. Unlike the majority, this writer does not find that the record demonstrates arbitrary or capricious behavior on the part of the Commission, or that the Commission abused its discretion, as the record plainly evidences a rational basis for its decision. I must respectfully dissent.

ORDER
IT IS ORDERED that the application for rehearing filed by the Department of Police be and it is hereby GRANTED.
*836 IT IS FURTHER ORDERED that the appellant be and he is granted twenty (20) days from the date of this Order and the appellee be and it is granted forty (40) days from the date of this Order to file their supplemental briefs, which briefs shall fully explain any step(s) each party took after oral arguments to address the panel's expressed concern that it was unable to locate or view video evidence relied upon by the Civil Service Commission.
IT IS FURTHER ORDERED that oral argument will be on Tuesday, November 17th, 2009 at 11:00 A.M.
/s/ James F. McKay, III
Judge James F. McKay, III
/s/ Roland L. Belsome
Judge Roland L. Belsome
/s/ Paul A. Bonin
Judge Paul A. Bonin

ON REHEARING GRANTED
PAUL A. BONIN, Judge.
Robert Evangelist, a New Orleans police officer, appealed his termination by the Superintendent of Police, Warren Riley, to the New Orleans Civil Service Commission. The Commission denied his appeal. He then filed an appeal in this court. We reversed that denial and we rendered judgment in Mr. Evangelist's favor. Upon the timely application of the appointing authority, we granted rehearing in this matter in order to consider video evidence which was inaccessible to us at the time we first decided this appeal. Having now accessed the video evidence, and after allowing the parties additional briefs and oral argument, for the reasons which follow, we reverse the decision of the Commission.

I
When counsel for the parties initially appeared for oral argument, the panel judges advised them that, except for a very limited and irrelevant segment, the video evidence referenced in the transcript and in their briefs was not a part of the record in this court. They were cautioned at that time to investigate the absence of the video evidence. After a reasonable period of time passed and there was no communication from counsel about what appeared to be important evidence missing from the record, the original decision was rendered. Upon its receipt of the decision, the Commission informally communicated with the court, reviewed the submission of evidence, and informed the court of special, proprietary procedures necessary to access the relevant portion of the video evidence.
Later, counsel for the parties in their briefs explained their post-argument silence as having exclusively relied upon assurances from the Commission that all evidence had been transmitted to the court. In any event, the Department of Police timely requested rehearing, which the court immediately granted so that it could access the video evidence upon which the Commission primarily relied for its decision to uphold the appointing authority's action.
In order to avoid a re-occurrence of the problems associated with evidence which may be technologically "hidden" from access by the court, the court en banc has adopted the Local Rule 14, effective February 1, 2010, which provides:
LOCAL RULE 14 Electronic Audio and Video Evidence
1. All electronic audio and video evidence submitted to the Court shall be in the Windows Media Audio (WMA) or Windows Media Video (WMV) format to ensure that the evidence can be played on the default Windows Media Player.
2. In the event that audio or video evidence cannot be converted to the required *837 formats, the software or codec required to view the evidence must be provided. This must include a description of the software or codec and instructions on how to install and use the software. Counsel for the parties must also inform the clerk of court in writing of these circumstances within five (5) days of the lodging of the record.
3. The following information must be provided with all submitted electronic evidence:
Title of file
Brief description of what is contained in
the file
Length of file
Number of files
File format
Guarantee of no virus
The antivirus software that was used to scan the files and the date of the virus definitions
It is the exclusive responsibility of counsel for all parties to ensure that all electronic audio and video evidence works properly before submitting it to the Court.

II
Mr. Evangelist was a classified employee with permanent status in the New Orleans civil service system. He had been employed as a police officer since March 16, 2003, and was designated as a Police Officer I. On the evening of October 8, 2005, he and his fellow officer Lance Schilling were on foot patrol duty in the French Quarter of New Orleans, on Bourbon Street, near the corner of Conti Street. Two mounted policemen were nearby in the street. A post-Hurricane Katrina curfew remained in effect for the city struggling to return to normal business and activity in the French Quarter and elsewhere, after the storm and flooding.
Robert Davis, a visitor to the city, approached the rear of one of the police horses, a charged conversation between him and the police officers erupted, and Mr. Davis touched Mr. Evangelist's chest. Mr. Evangelist and Mr. Schilling attempted to subdue and handcuff Mr. Davis, who clutched the iron grillwork on a storefront to resist being handcuffed. Two unidentified FBI agents entered the struggle, and one of them brought Mr. Davis to the sidewalk,[1] causing Mr. Davis' head to strike the pavement, sustaining injury. Eventually Mr. Davis was restrained and, handcuffed, placed in an EMS ambulance called to the scene to handle the head injury, which had stopped bleeding before the ambulance arrived. An EMT evaluated Mr. Davis, who was found to be alert, oriented and awake. Mr. Davis was subsequently taken to the temporary site for handling arrestees, the Greyhound Station, for booking.
The encounter occurred about six weeks after Hurricane Katrina. Mr. Davis testified that he was in New Orleans to check on his property. He had ventured from his hotel room near the perimeter of the French Quarter in search of cigarettes. Parts of the encounter between the officers and Mr. Davis were captured on videotape, possibly by more than one source, and were broadcast locally and nationally. At least a portion of the video recording was filed into evidence with the Commission.
An internal investigation was initiated by the Public Integrity Bureau of the police department. Following the investigation, *838 a departmental hearing was conducted by a deputy superintendent. On December 21, 2005, immediately upon the conclusion of the hearing, Superintendent Riley, the appointing authority, issued to Mr. Evangelist a letter of termination, which specified the charge on which the termination was based.
Mr. Evangelist appealed his termination to the New Orleans Civil Service Commission. A referee, assigned by the Commission, conducted an evidentiary hearing and issued a report recommending to the Commission that the appeal be granted because the appointing authority failed to prove the charges against Mr. Evangelist. The Commission did not conduct any further hearings, but, on August 27, 2008, rendered its decision denying the appeal. It is from that decision that Mr. Evangelist appeals to this court.

III
"No person who has gained permanent status in the classified . . . city service shall be subjected to disciplinary action except for cause expressed in writing." La. Const., art. X, § 8(A); La. Const. art. X, § 1(B). New Orleans police officers are included in the protection guaranteed by this provision. Walters v. Dept. of Police of New Orleans, 454 So.2d 106, 112 (La. 1984). "Legal cause exists whenever an employee's conduct impairs the efficiency of the public service in which the employee is engaged." Cittadino v. Dept. of Police, 558 So.2d 1311, 1315 (La.App. 4th Cir. 1990).
The U.S. Supreme Court considers this type of tenured civil service employment to be a property right which is protected by the Due Process Clause of the U.S. Constitution. The Supreme Court in Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), held:
The essential requirements of due process. . . are notice and an opportunity to respond. . . . The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. (emphasis added)
Further, the Loudermill Court explained: "the point is straightforward: the Due Process Clause provides that certain substantive rights  life, liberty, and property  cannot be deprived except pursuant to constitutionally adequate procedures . . . the right to due process `is conferred not by legislative grace but constitutional guarantee.' [citation omitted]." Id. at 541.
It is a basic precept of our system of justice, fair play, and due process that one accused  of a crime, an administrative breach of conduct or code violation, or a civil tort  be given notice of that which he or she is alleged to have done or failed to have done. Thus our jurisprudence has required that written notice be given to a public employee. See La. Const. art. X, § 8; Williams v. Dept. of Property Mgmt., 02-1407, p. 2 (La.App. 4 Cir. 4/16/03), 846 So.2d 102, 104; Riggins v. Dept. of Sanitation, 92-1921 (La.App. 4th Cir.1993), 617 So.2d 112. Importantly, we emphasize that in Webb v. Dept. of Safety & Permits we held that "notice of the charges should fully describe the conduct complained of. . . to enable [the employee] . . . to fully answer and prepare a defense." Id., 543 So.2d 582, 584 (La.App. 4th Cir.1989) (citing Robbins v. New Orleans Public Library, 208 So.2d 25, 28 (La.App. 4th Cir. 1968)) (emphasis added).
A civil service employee cannot be charged with conduct specifically described in the written charge and then be expected, much less required, to defend conduct which was not described or conduct which *839 is different from that which was described. In Williams v. Dept. of Property Mgmt. the City terminated a motor vehicle examiner on the basis of her alleged alteration of her time card for one day. After the hearing, incidents of payroll fraud on two other days were discovered, and Williams was terminated. The termination letter listed three separate occasions of payroll fraud. We stated:
Since the Department of Property Management used these other two incidents of payroll fraud to reach its decision to terminate plaintiff's employment, the plaintiff was entitled to notice of these additional charges and an opportunity to present a defense in regards[sic] to these additional charges. The requirements of La. Const. Art. 10 § 8 and Loudermill were not met.
Id. at p. 5, 846 So.2d 102 at 105 (emphasis added).
In the case at bar, on the day of the departmental hearing, the appointing authority issued a letter sustaining the charges[2] and terminating Mr. Evangelist.[3] The appointing authority's charging letter, which is the requisite constitutional basis for subjecting Mr. Evangelist to any disciplinary action "for cause expressed in writing" under La. Const., art. X, § 8(A), accused Mr. Evangelist of the following specifically described conduct:
. . . on or about October 8, 2005, you were involved in a physical altercation with Mr. Robert Davis. A video of the incident captured you striking Mr. Davis in the torso while he was lying on the ground with three other police officers holding him down. (emphasis added)
The purpose of requiring the specific description of the conduct which the appointing authority deems deserving of disciplinary action is to permit the employee to know precisely which conduct he or she must defend before the Commission.
Mr. Evangelist timely exercised his constitutional right to an appeal from the appointing authority's disciplinary action to the New Orleans Civil Service Commission. La. Const., art. X, § 8(A). The Commission has "the exclusive power and authority to hear and decide all removal and disciplinary cases . . ." La. Const., art. X, § 12(B); Pope v. New Orleans Police Dept., 04-1888 (La.App. 4 Cir. 4/20/05), 903 So.2d 1. Before the Commission, "the burden of proof on appeal, as to the facts, shall be on the appointing authority." La. Const., Art. X, § 8(A) (emphasis added); Walters, supra, at 112-13. "The appointing authority must prove by a preponderance of the evidence the occurrence of the complained of activity and that the conduct impaired the efficient operation of the public service. Newman v. Dept. of Fire, 425 So.2d 753, 754 (La.1983); Cittadino, 558 So.2d at 1315 (La.App. 4 Cir.1990)." Barquet v. Dept. of Welfare, 620 So.2d 501, 505 (La.App. 4th Cir.1993) (emphasis added);[4]Cure v. Dept. of Police, 07-0166, p. 2 *840 (La.App. 4 Cir. 8/1/07), 964 So.2d 1093, 1094, citing Marziale v. Dept. of Police, 06-0459, p. 10 (La.App. 4 Cir. 11/8/06), 944 So.2d 760, 767. The corollary is that the appointing authority is not permitted to substitute proof before the Commission of the occurrence of some uncomplained-of activity.
The Commission assigned the appeal to its referee: "[The Commission] may appoint a referee to take testimony, with subpoena power and power to administer oaths to witnesses." La. Const., art. X, § 12(B). After hearing testimony and considering other evidence, the referee issued a written report on February 25, 2008, which concluded: "The appointing authority has failed to meet its burden of proof that the Appellant violated any internal rule. Based on the foregoing, the appeal should be granted."
Other than the evidentiary proceeding before its referee, the Commission did not conduct any further evidentiary hearings. On August 27, 2008, the Commission rendered its decision denying the appeal of Mr. Evangelist from the appointing authority's termination of him as well as the ten-day suspension for violation of professionalism. Mr. Evangelist then timely appealed to this court.
The Commission's decision is subject to appellate review on any question of law or fact, determining if its order was arbitrary, capricious, or characterized by an abuse of discretion. La. Const. Art. Art., § 12(B); Barquet, 620 So.2d at 505; Cure, 07-0166 at p. 2, 964 So.2d at 1095; Walters, 454 So.2d 106, 114 (La.App. 4th Cir.1984). When there is no rational basis for the Civil Service Commission's action, its decision is arbitrary and capricious. Bannister v. Dept. of Streets, 95-0404, p. 8 (La.1/16/96), 666 So.2d 641, 647.
The judicial review function in a matter appealed from a civil service commission is "multifaceted," Walters, supra at 113-14:
In reviewing the commission's procedural decisions and interpretations of law the court performs its traditional plenary functions of insuring procedural rectitude and reviewing questions of law. Due concern both for the intention of the constitution and for the boundaries between the functions of the commission and of the court, however, demands that a reviewing court exercise other aspects of its review function with more circumspection. In reviewing the commission's findings of fact, the court should not reverse or modify such a finding unless it is clearly wrong or manifestly erroneous. In judging the commission's exercise of its discretion in determining whether the disciplinary action is based on legal cause and the punishment is commensurate with the infraction, the court should not modify the commission's order unless it is arbitrary, capricious, or characterized by abuse of discretion. R.S. 49:964; Save Ourselves, Inc. v. The La. Environmental Control Comm., 452 So.2d 1152 (La.1984); Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (D.C.Cir.1978); K. Davis, Administrative Law (1982 Supp.) at 536 et seq.

IV
The evidentiary hearing conducted before the Commission's referee provides the opportunity for the appointing authority to prove its case as set out in its charging letter against the police officer and for the police officer to answer and defend those charges. In our original opinion we set forth in detail the testimony of the witnesses.
*841 Before addressing the testimony and the exhibits, including the now accessible video, we first address the matter of the Commission's factual finding that Mr. Evangelist was attempting to effect an unlawful arrest of Mr. Davis:
"There is no evidence in the record that Mr. Davis was breaking any law, a suspect for any crime, disturbing the peace or threatening anyone. There is no evidence that he had been drinking ... the possibility that he was carrying a concealed weapon was minimal."
Of course, if this finding is correct and justified, almost any force used by a police officer upon a citizen would be excessive and unreasonable and deserving of discipline. A person does, of course, have a right to resist an unlawful arrest. See, White v. Morris, 345 So.2d 461 (La.1977); State v. McCoy, 546 So.2d 240 (La.App. 2 Cir.1989). But the appointing authority never accused Mr. Evangelist of attempting an unlawful arrest of Mr. Davis, and it most assuredly did not attempt to establish facts which would support such a factual finding by the Commission. Mr. Evangelist, not having been accused by the appointing authority of making an unlawful arrest, was not required to introduce evidence before the Commission to establish that the arrest was lawful, and, of course, he did not.
Mr. Evangelist was in uniform and Mr. Davis knew he was a police officer. Sgt. Gay, who conducted the internal investigation on behalf of the NOPD, acknowledged that Mr. Davis was resisting the four officers trying to handcuff him, and that Mr. Evangelist was authorized to use force to accomplish a lawful arrest. The NOPD Operations Manual, Chapter 1.13, "Policy on the Use of Force," set forth the applicable standard: "Police Officers shall use only that force reasonably necessary to effectively bring an incident under control, while protecting the lives of citizens and officers." (emphasis added) Police instructors Najolia and Schindler both considered the detention to be lawful and use of force to be appropriate based on the noncompliance of Mr. Davis in his resistance to being handcuffed. On this evidence, no reasonable factfinder could, or should, conclude that Mr. Davis' arrest was unlawful. The Commission's finding of fact that Mr. Davis' arrest was unlawful is clearly wrong.
La. R.S. 14:108 makes it unlawful to resist a police officer when the person knows that the police officer, in his official capacity, is arresting him. Further, La. C. Cr. P. art. 220 provides:
A person shall submit peaceably to a lawful arrest. The person making a lawful arrest may use reasonable force to effect the arrest and detention, and also to overcome any resistance or threatened resistance of the person being arrested or detained.
Mr. Davis was not entitled to resist Mr. Evangelist or any of the other law enforcement officers, and Mr. Evangelist was entitled to use "reasonable force" to effect Mr. Davis' arrest.
The Commission erred when it evaluated Mr. Evangelist's use of force as if he were effecting an unlawful arrest.

V
We turn now to the evidence before the Commission to determine whether the decision of the Commission, unlike that of its own referee who actually heard the witnesses and observed them while they described the scenes in the videos, was arbitrary, capricious or characterized by abuse of discretion in finding that the appointing authority proved its charges by a preponderance of the evidence. In discharging our responsibilities in reviewing the decision of the Commission, we focus on evidence *842 which supports the charges which Mr. Evangelist prepared to defend against. We cannot consider conduct which has not been charged as an independent basis to uphold either the Appointing authority's action or the Commission's decision. So we return to the specific allegation of misconduct as charged in writing:
... on or about October 8, 2005, you were involved in a physical altercation with Mr. Robert Davis. A video of the incident captured you striking Mr. Davis in the torso while he was lying on the ground with three other police officers holding him down. (emphasis added)
In our original opinion we observed the overwhelming absence of testimony from numerous eyewitnesses, with the exception of Mr. Evangelist and Mr. Davis. Thus, considerable testimony consists of the witnesses interpreting the video evidence. That interpretative testimony was described in detail in our original opinion. The testimony of Sgt. Gay, the investigator from the Public Integrity Bureau of the New Orleans Police Department, is illustrative of what was seen on one video:
... Officers Evangelist and Schilling affecting [sic] the arrest on Mr. Davis. During that video it shows Officer Evangelist punching Mr. Davis four times to the left side of his head. Also, the video shows that Mr. Davis is taken to the ground at which point he begins to bleed, and he's allowed to stay on the ground, I think approximately four minutes and twenty-two seconds, according to the video, bleeding until EMS arrives on the scene.
Another video is further interpreted by the sergeant: "This one is starting off after the incident is almost over. Right now he is laying[sic] on the ground handcuffed."
Okay. Again, you see Officer Schilling punching Mr. Davis ... The guy with the black shirt on is an FBI agent. The other guy with ... the cap on ... That's Officer Evangelist. And you can see he kneed him a couple of times and then punched him right there while he was on the ground.... And he's going to punch him again ... that's pretty much the extent of it.
Notably, Sgt. Gay's interpretative testimony is not focused on the conduct described in the charging letter. He is describing conduct by Mr. Evangelist of "punching Mr. Davis four times to the left side of his head." Our review of the video evidence reveals that this is uncharged conduct, which Mr. Evangelist was not put on notice to defend. The punches to the head area which are observable in the video evidence all occurred while Mr. Davis was standing, before he was brought to the ground by two agents of the Federal Bureau of Investigation who intervened to assist the arresting officers. It is undisputed that it was the action of the FBI agents, not Mr. Evangelist, which resulted in any bleeding. Superintendent Riley did not find objectionable the conduct of Mr. Evangelist while Mr. Davis was standing and did not charge him with violating departmental rules for that conduct. The superintendent never viewed the video evidence during the hearing before the referee.
The charged conduct was confined to Mr. Evangelist's actions after Mr. Davis was brought to the ground.
Sgt. Donald Harris, an instructor in the use of force at the NOPD training academy, who also viewed the video evidence during the hearing, testified that Mr. Evangelist acted within the force continuum if (as he was charged) he punched Mr. Davis in the torso to force compliance. Sgt. Harris described shoulders, arms and legs as appropriate areas for a strike with hard hands. According to Sgt. Harris, *843 strikes to those areas are calculated to get the subject's arms to relax to facilitate compliance with a police officer's attempt to handcuff." Sgt. Harris interpreted his view of one of the videos:
That was Officer Evangelist to the backhis back was to me throwing punches. It looked to me like head strikes. However, there is a technique that we teach, again with the closed fist, for the muscle to relax on the back of thesort of the shoulder blade that we teach, a strike to part of the whole what's called the brachial plexus tie-in to weaken the arm so that the officer can bring it totake it to the back and handcuff the person.
And later he stated:
Then if they [the blows] were to the back, I mean, it looked likeI mean, that's what it looked like to me. But we would teach that there was a blow that an officer could strike to the back, again around the shoulder blade area."
If it were concluded that the blow was to the back or around the shoulder blade, Sgt. Harris testified that such a blow would be "acceptable." Further, he noted that from his review of the video, when Davis was positioned on the pavement, no strikes were thrown at him. Likewise, responding to a question from the referee if it was appropriate "to use his knee to force his arm behind his back?", Sgt. Gay replied, "If that was what he was doing and that needed to be done at that point, yeah." Also, in response to the referee, who was relating the evidence to the written charge, Sgt. Gay stated that if Mr. Evangelist punched the suspect on the side of the torso to force the person to react in order to reposition the suspect's arm, such would be "absolutely" acceptable use of force.
Not only were the witnesses offered by the appointing authority in agreement that the conduct as described in the charging letter would not constitute excessive or unauthorized use of force, but expert witnesses offered by Mr. Evangelist to help him defend the written charges agreed that the charged conduct was neither excessive nor unauthorized. Dr. Wade Schindler testified that:
What I observed, and in also talking to Officer Evangelist what I observed was about five minutes of a struggle. It's very, very unusual for police to be involved in a struggle like that over that length of time. There's always this interaction between the person to be arrested and the officers. Usually, that takes place within a few seconds or maybe a little bit more and then it's over, there's compliance.
What I saw here was about five minutes of non-compliance. I saw four police officers, two federal, two local, attempting to get compliance. And at no time, until the very end, were they able to get Mr. Davis to comply with the request.... I did not see any voluntary compliance.
Dr. Schindler expressed his opinion that Mr. Evangelist acted appropriately in conformity with his training and NOPD rules on use of force. The blows to Mr. Davis' torso were appropriate and calculated to make him comply with handcuffing. Striking an arrestee in the area "below the earlobe and down to the bottom of the neck ... is authorized under the training that they had." When asked, "Were any of the blows that you saw Officer Evangelist administer improper or inconsistent with his training?" Dr. Schindler replied, "No." "He did it exactly as it is taught."
Major Kerry Najolia, Director of Training at the Jefferson Parish Sheriff's Office Training Academy and a certified POST instructor and expert in "force continuum" *844 (the protocol or escalation of methods and devices to subdue opponents with appropriate forcefrom a wave-over to a taser) testified that Mr. Evangelist acted within protocols for subduing a noncompliant adversary. "Clearly my belief in watching the video is that Officer Evangelist ... clearly had sufficient cause to escalate more quickly than he did in this situation." Major Najolia stated:
[P]olice officers are absolutely trained that they can punch, kick, elbow, knee to the entire body area.... And, basically what Officer Evangelist and Officer Shilling utilized was techniques that were directed to soft tissue areas. Areas that were on the lower level in the lower region of the target zones.
He considered a kick prior to Mr. Davis' being handcuffed to be appropriate: "[U]ntil those hands are placed behind his back and the handcuffs are secured, then clearly there is a tremendous danger and risk to the officer's safety and the other innocent people in that area." When asked "Did you see any force employed by Mr. Evangelist after the threat had been neutralized or after Mr. Evangelist had him under control in the handcuffs?" Major Najolia replied,
There was a touching of ... Mr. Davis' shoulder area on a couple of occasions, and it could be two or three times when it appeared that Mr. Davis was, in fact, attempting to sit up. It appeared to me, and based on what Officer Evangelist told me, he was just ... basically just trying to keep Mr. Davis in a position where he would no longer be a significant danger or in a position where he could injure himself.
Asked if these actions were appropriate, Major Najolia replied, "Certainly," stating:
Once Mr. Davis is walking and placed against the wall, clearly it was evident to me that both Officer Evangelist and Officer Schilling were doing everything that they possibly could to get Mr. Davis' hands behind his back so that they could apply handcuffs. Based on the fact that they could not get those hands behind his back, it was because of his resistance and aggressive movements away to prevent them from putting his hands behind his back, so that clearly is resistance in my opinion and aggression.
Neither of these experts interpreted the video evidence as supporting the charged conduct.
The Commission's referee, after he heard live testimony, viewed images including those depictions, and reviewed the trial transcript testimony entered in evidence at the hearing, in his report to the Commission, observed of a video image, "[I]t's difficult to tell from that angle" where blows to Mr. Davis landed, and went on to state:
Well, I don't think the issue is where the blows landed, because it has already been determined that the blows were not to the head. I mean, the disciplinary letter says it was to the torso. Granted, it's difficult to tell from that angle, but that's what the conclusion was.
Mindful of the appointing authority's charges against Mr. Evangelist, the referee concluded: "Based upon the overwhelming evidence the Appellant reasonably complied with the use of force continuum" and "the appointing authority has failed to meet the burden of proof that the Appellant violated any internal rule."

VI
Although the referee reported and recommended to the Commission that Mr. *845 Evangelist's appeal should be granted,[5] the Commission denied the appeal, basing its decision largely on its evaluation of the video evidence:
Important evidence in this case is a videotape of the incident taken by a pedestrian on Bourbon Street.... A portion of the videotape, agreed to by all counsel, was introduced into evidence. It provides a more accurate account of the incident than the simplistic versions testified to by Mr. Davis and [Mr. Evangelist], both of which we take with a grain of salt. To this observer the videotape shows ... Mr. Davis is seen on the pavement facing upwards with [Mr. Evangelist] crouching beside him. [Mr. Evangelist] strikes Mr. Davis at least twice in his head area at a time when Mr. Davis appears immobilized and offering little resistance.
(emphasis in original).
The Commission decision further stated:
The videotape shows that at the time Appellant struck Mr. Davis four times, two of which were in his head area while he was lying on the pavement, he was physically restrained by four police officers and there was no necessity to take such violent action particularly since Mr. Davis offered to voluntarily turn over for the purpose of permitting the handcuffs to be attached. (emphasis added).
Like the referee's and unlike the Commission's, our own review of the video evidence, which may not constitute all of the videos in the public domain, coupled with the consistent opinions of the experts offered by both the appointing authority and the civil service employee, compels us to conclude that there are no blows, punches, hits, or strikes by Mr. Evangelist to Mr. Davis's torso area after he was down on the ground which exceeded Mr. Evangelist's authority as a New Orleans police officer.
As suggested by the referee's own comments while he viewed the video evidence in the presence of the expert witnesses, reasonable persons may well disagree about what conduct is captured by the camera. And if that were the only issue for our review, it is clear that we would defer to and accept the Commission's reasonable view of the video evidence. But that is not the case before us.
The Commission's decision cannot rest on a factual finding that the appointing authority did not charge and that the civil service employee had no notice to prepare to defend against. The Commission cannot uphold the appointing authority by finding that it proved uncharged conduct. By basing its decision upon uncharged and undefended conduct, the Commission erred as a matter of law. *846 Its decision violates Mr. Evangelist's due process rights. We reiterate what the United States Supreme Court has instructed:
The essential requirements of due process... are notice and an opportunity to respond.... The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. (emphasis added)
Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). "[T]he right to due process `is conferred not by legislative grace but constitutional guarantee.' [citation omitted]." Id. at 541.
In exercising our multi-faceted review function under Walters, we first conclude that the Commission, as we have explained, was clearly wrong in its factual finding that Mr. Evangelist was effecting an unlawful arrest of Mr. Davis. The correct finding is that Mr. Davis was resisting a lawful arrest by Mr. Evangelist, who was authorized to use reasonable force in making the arrest. We next conclude that the Commission exceeded its own authority in basing its decision upon a finding of fact (i.e. blows to the head) which had not been charged by the appointing authority. The Commission was obliged to determine whether the appointing authority had proved what it had charged and what Mr. Evangelist had defended. Although the Commission could have reasonably concluded that the Appointing Authority did prove by a preponderance of the evidence that Mr. Evangelist struck "Mr. Davis in the torso while he was lying on the ground with three other police officers holding him down," we further conclude that from the totality of the evidence, including the unanimous opinion evidence of the experts who testified for both parties, that such force does not constitute "unauthorized force" under the circumstances. The Commission could not reasonably disregard the opinion testimony. Had the Commission confined itself to a determination of whether the appointing authority proved by a preponderance of the evidence that Mr. Evangelist's striking Mr. Davis's torso constituted the use of excessive and unauthorized force, it is clear that it would have necessarily found that the appointing authority had not proved that the complained of activity or dereliction by Mr. Evangelist occurred. See Cittadino, 558 So.2d at 1315 (La.App. 4 Cir.1990).
We conclude, therefore, that there is no rational basis for the Commission's determination that there was legal cause for Mr. Evangelist's removal from the civil service as well as the related discipline.

DECREE
We reverse the ruling of the New Orleans Civil Service Commission. Robert Evangelist is to be restored to his New Orleans Police Department rank as of October 8, 2005, and all benefits, seniority standing, and salary are to be reinstated as of that date.
REVERSED AND RENDERED.
BELSOME, J., Dissents with Reasons.
Officer Evangelist's behavior cannot be excused under the guise that he was not provided adequate notice of the nature of the charges lodged against him. In reversing the Commission, the majority narrowly focuses on a single sentence within the charging letter. Specifically, the majority takes issue with the letter's reference to Appellant's errant blows to the torso of the 64-year-old Davis while lying defenseless on the ground, but the omission of Appellant's other acts of brutality, such as punching Mr. Davis in the head area. The majority concludes that this *847 perceived oversight somehow relieves Appellant of any culpability because notice was lacking to prepare an adequate defense. This writer finds that the charging letter nevertheless plainly advised Appellant of "the nature of the misconduct in sufficient detail to enable [him] to adequately prepare his defense." Montgomery v. Dept. of Streets, 593 So.2d 1352, 1354 (La.App. 4 Cir.1992). I dissent.
The purpose of the charging letter "is to inform an employee of the charges against him in detail, and to limit and restrict the commission hearing to those charges." Id. (emphasis added). In this case, Appellant was charged with several Moral Conduct violations. Notably, one of the Moral Conduct charges detailed in the letter was 17271 MCS 54:96 Relative to Battery, defined as "the intentional use of force or violence upon the person of another." (emphasis added). Appellant was also charged with a violation of Unauthorized Force, which provides that "[e]mployees shall not use or direct unjustifiable physical abuse, violence, force or intimidation against any person." (emphasis added). Finally, Appellant was also charged with a Professional Conduct violation, which provides:
Employees shall conduct themselves in a professional manner with the utmost concern for the dignity of the individual with whom they are interacting. Employees shall not unnecessarily inconvenience or demean any individual or otherwise act in a manner which brings discredit to the employee of the Police Department.
The logic in concluding that blows to the head area are somehow not encompassed by any of these charges escapes this writer. Moreover, the language regarding Appellant striking Mr. Davis in the torso was with regard to what was captured on the videotape of the altercation;[1] it was not in the section of the letter detailing the specific charges against him. Review of the charging letter in its entirety plainly evidences that Appellant was put on notice to defend against the charges against him, to wit: Adherence to Law, Battery, Unauthorized Force, and Professionalism.[2]
The case relied upon by the majority, Williams v. Dept. of Property Mgmt., is distinguishable from the facts of the instant case. In Williams, the employee was informed by letter of one instance of alleged payroll fraud which occurred on one day only; at the pretermination hearing, this one incident of payroll fraud was the only matter discussed. Williams v. Dept. of Property Mgmt., XXXX-XXXX, p. 4 (La.App. 4 Cir. 4/16/03), 846 So.2d 102, 105. Subsequent to the pretermination hearing, plaintiff was terminated. Id. According to the termination letter, however, *848 the employee altered her time card on not one, but three separate occasions; additionally, the letter indicated that after the hearing, "the committee `reconvened and reviewed additional time cards.'" Id. Nothing in the record suggested that the employee was in attendance at the committee's reconvened meeting regarding the additional time cards. Id.
The most obvious distinction between Williams and the instant case is that no additional charges were made against Appellant subsequent to the charging letter. Unlike the employee in Williams, Appellant was fully apprised of all the charges against him and was provided the opportunity to present a defense for each of those charges.
The majority's semantics argument is flawed for another reason. Ironically, although the foundation of the majority's argument turns upon perceived missing language within the charging letter, at the same time, the majority reads language into the Commission's decision that does not exist. Specifically, the majority submits that the Commission erred in making a factual finding that Appellant was attempting to effect an unlawful arrest of Mr. Davis. Because the Commission found that Mr. Davis was apparently not breaking any law at the time of the incident, the majority concludes, the Commission's findings thus implied that Appellant attempted to make an unlawful arrest. The majority ostensibly makes this argument because when any force is used upon a private citizen absent a valid arrest, it constitutes a battery. Fisher v. Department of Public Safety, 555 So.2d 626, 630 (La.App. 4th Cir.1989).
This writer finds that such a conclusion is not supported by the record. In fact, as the majority acknowledges, the Appointing Authority at no time accused Appellant of making an unlawful arrest on Mr. Davis. Dr. Wade Schindler, accepted as an expert in force continuum, and Kerry Najolia, the Director of Training at the Jefferson Parish Sheriff's Training Academy, both were of the opinion that Mr. Davis' detention was lawful, and that Appellant's use of force was justified. No witness testified that the arrest was unlawful. Considering the foregoing, this writer cannot agree that the Commission evaluated Appellant's use of force as if he were effecting an unlawful arrest. While Appellant was entitled to use "reasonable force" in lawfully arresting Mr. Davis, the Commission explicitly found that Evangelist did not use reasonable force, but used "excessive force". Simply because the Commission determined that Evangelist used excessive force does not mean that the Commission implicitly determined the arrest to be unlawful. Moreover, it is well-settled that excessive force can be found when an officer makes a lawful arrest. See, e.g., Kyle v. City of New Orleans, 353 So.2d 969 (La.1977).
Notably, a review of the Commission's decision evidences that the Commission evaluated the circumstances surrounding Mr. Davis' arrest as if it were a lawful arrest. In Kyle v. City of New Orleans, the Louisiana Supreme Court recognized that "[t]he use of force when necessary to make [a lawful] arrest is a legitimate police function." Kyle, 353 So.2d at 972. Officers may not use excessive force in making a lawful arrest; thus, "[w]hether the force used is reasonable depends upon the totality of the facts and circumstances in each case." Id. at 973. Thus, "[a] court must evaluate the officers' actions against those of ordinary, prudent, and reasonable men placed in the same position as the officers and with the same knowledge as the officers." Id. A finding regarding the degree of force used by an officer is a factual issue, entitled to great weight and subject *849 to the manifestly erroneous/clearly wrong standard of review. See id.
In making a determination regarding whether an officer's force was excessive, the Louisiana Supreme Court has articulated several factors to be considered: (1) the character of the arrestee; (2) the risks and dangers faced by the officers; (3) the nature of the offense; (4) the probability of the arrestee's escape; (5) the existence of alternative methods of arrest; (6) the physical size, strength, and weaponry of the officers as compared to the arrestee; and (7) the exigencies of the moment. Kyle, 353 So.2d at 973. The Commission's written findings evidence consideration of nearly all of these factors.
The Commission found that as an unarmed, 64-year-old man, "[Mr. Davis] was not a serious threat to the safety of the four officers using force on him and there was no need to beat him up to the point where he needed stitches on his face and was temporarily unconscious." This correlates with Kyle factors (2) and (6), the risks and dangers faced by the officers and the physical size, strength, and weaponry of the officers as compared to the arrestee. See Kyle v. City of New Orleans, 353 So.2d 969, 973 (La.1977). The Commission noted that "[w]e do not see on the videotape any indication that handcuffs were being swung around on one hand and used as a weapon by Mr. Davis or that he was attempting to grab the holstered guns of Appellant and Officer Schilling." This finding corresponds to Kyle factor (4), the probability of Mr. Davis' escape, and again factor (6). Id. The Commission also found that Mr. Davis' overreaction to Appellant and Officer Schilling's intervention was "not to be condoned" but "did not by itself justify Appellant and his partner in forcibly placing Mr. Davis against a wall and thereafter on the pavement and striking him in the head area." This determination correlates to Kyle factor (3), the nature of the offense and Kyle factor (7), the exigencies of the moment. Id.
Finally, the Commission concluded that "[t]he videotape shows that at the time Appellant struck Mr. Davis four times, two of which were in his head area, while he was lying on the pavement, he was physically restrained by four police officers and there was no necessity to take such violent action particularly since Mr. Davis offered to voluntarily turn over for the purpose of permitting the handcuffs to be attached," and that Mr. Davis also "appeared stunned" from being struck in the head area while against the wall. (emphasis added). These determinations can be classified as Kyle factors (1), the character of the arrestee, and again factors (6) and (7). Id. Accordingly, this writer cannot agree that the Commission factually found, either implicitly or explicitly, that Appellant was attempting to make an unlawful arrest.
Turning to the applicable standard of review, this writer finds that the majority erred in considering only evidence and findings regarding Appellant's blows to Mr. Davis' torso area, while recognizing that the video plainly evidences Appellant striking Mr. Davis in the head area as well. As previously noted herein, the charges set forth in the charging letter put Appellant on notice of the charges against him, one of which was battery (excessive force), which encompasses the blows to Mr. Davis' head area as well as his torso. Particularly when reviewing the video evidence of the incident together with the Commission's findings, this writer cannot say that no rational basis existed to justify the Commission's decision. It is well-settled that reviewing courts shall not overturn a Civil Service Commission's factual findings when a rational basis to justify the Commission's determinations exists. *850 Walters v. Dept. of Police of New Orleans, 454 So.2d 106, 112 (La.1984).[3]
The Civil Service Commission's description of the events contained in the video recording viewed in connection with its decision is as follows:
Important evidence in this case is a videotape of the incident taken by a pedestrian on Bourbon Street. The videotape has received local and national media attention. Reactions vary widely. A portion of the videotape, agreed to by all counsel, was introduced into evidence. It provides a more accurate account of the incident than the simplistic versions testified to by Mr. Davis and Appellant, both of which we take with a grain of salt.
To this observer the videotape shows Mr. Davis receiving several severe blows to the head area by Officer Schilling while Mr. Davis is standing and facing a wall. He does not appear in the videotape to be a threat to the officers as he faces the wall. Appellant swung at Mr. Davis' neck while he was in this position and "missed" and struck him in his arm with a baton.
Thereafter Mr. Davis is seen on the pavement facing upwards with Appellant crouching beside him. Appellant strikes Mr. Davis at least twice in his head area[4] at a time when Mr. Davis appears immobilized and offering little resistance. Unfortunately, part of the videotape is obscured by a horse which is being moved by its rider (a policeman) in front of the camera. After the handcuffs are attached and the officers cease contact with Mr. Davis, he lies on the pavement barely moving.
While this incident was being filmed an unidentified pedestrian at the scene is heard on the videotape to say"Did you get that on filmhe surrendered and then they hit him on the head and that's when he turned around and started fighting ..."[5]
In this case, the Civil Service Commission found that the Appointing Authority had good and lawful cause for taking disciplinary action. The Commission reviewed the testimony and evidence presented at the hearing in making its determinations, most notably that of Appellant, who testified that he struck Mr. Davis four times while he was lying on the ground and admitted attempting to strike Mr. Davis in the neck while he was standing against the wall.[6] The Commission also reviewed the *851 testimony of the EMT, Rebecca Calvo, who observed that Mr. Davis had a contusion with laceration[7] to his right eyebrow and a contusion on his entire left eye. Ms. Calvo further testified that Mr. Davis' face was so swollen with cuts and lacerations that she could not examine his pupils, and that Mr. Davis advised her that he could not open his eyes because it was too painful.[8]
Sgt. Howard Gay of the Public Integrity Bureau also testified. The Commission reviewed his testimony regarding his investigation of the complaint filed against Appellant and his sustaining of charges against Appellant for violations of adherence to law relative to a battery, lack of professionalism and lack of moral conduct. Sgt. Gay viewed a videotape, which he testified as showing Appellant punching Mr. Davis in the head area and bracing Mr. Davis with his knee while on the ground and surrounded by four police officers. Sgt. Gay further testified that the video evidenced Mr. Davis being taken to the ground, at which time he began to bleed. Sgt. Gay stated that Mr. Davis was allowed to stay on the ground, bleeding, for four minutes and twenty-two seconds, until EMS arrived on the scene. Sgt. Gay testified that "[t]hose particular actions, in my estimation, did not concur with the training received at the Police Department, which indicated to me that they were in violation of department rules."
The Commission also reviewed testimony from Police Superintendent Warren Riley, who determined that it was necessary to discipline Appellant for violating the proper procedures for applying physical force. Supt. Riley testified that he made his determination after viewing a videotape of the incident, reviewing Sgt. Gay's investigation report, and participating in an official hearing with Operations Chief Officer Steven Nicholas.
Sgt. Donald Harris, the eight-year NOPD training instructor, also testified regarding the force continuum. The Commission noted the levels of the force continuum, beginning with oral directives and progressing to "soft hands," which he described as an officer using an open hand to direct the individual where to go. Only if the "soft hands" approach is ineffective is limited physical force appropriate, also termed "hard hands." According to Sgt. Harris, "hard hands" involves the striking of body parts such as shoulders, arms and legs. Specifically, he testified that continuous strikes to the radial muscle on the arm will cause a person's hand to relax so that the officer may handcuff the individual. Even in situations where "hard hands" are appropriate, Sgt. Harris testified that it is not appropriate to strike an individual in the head area. Sgt. Harris further testified that, from viewing the videotape, Appellant appeared to have struck Mr. Davis inappropriately about the head with "two head blows."[9]
*852 Considering the record in its entirety, this writer cannot agree that the Commission's factual findings warrant reversal. The Commission's factual findings with regard to employee discipline are entitled to great weight. "[A]s in other civil matters, deference will be given to the factual conclusions of the [Civil Service] Commission." Bannister v. Dept. of Streets, 95-0404 (La.1/16/96), 666 So.2d 641, 647. An appellate court should thus not reverse or modify such factual findings unless they are clearly wrong or manifestly erroneous. La. Const. art. X, § 12; Walters, 454 So.2d at 112.
With regard to the Commission's determinations regarding disciplinary action, "[i]n judging the Commission's exercise of its discretion in determining whether the disciplinary action is based on legal cause and the punishment is commensurate with the infraction, the [appellate] court should not modify the commission's order unless it is arbitrary, capricious or characterized by abuse of discretion." Id. A determination by the Commission is "arbitrary and capricious" if there is an absence of a rational basis for the action taken. Bannister, 666 So.2d at 647.
Unlike the majority, this writer does not find that the record demonstrates arbitrary or capricious behavior on the part of the Commission, or that the Commission abused its discretion, as the record plainly evidences a rational basis for its decision. The Commission appropriately found that the Appointing Authority proved by a preponderance of the evidence that Appellant committed a battery, used unauthorized force, and violated the Moral Conduct Code of Professionalism. It is also important to note that without the filmed documentation of this incident, we would be left with what is fundamentally a swearing contest which Mr. Davis could never expect to win. As outlined in my original dissent,[10] the limited amount of video review by this writer was more than sufficient to uphold the Commission's findings. The facts and evidence in this case cannot be ignored or swept aside. I dissent.
NOTES
[1] Davis testified that the FBI officer forced him to the ground and placed him in a chokehold.
[2] The evidence in the record does not identify or list any depiction other than the brief videotape recording presented to us on a single DVD disc, and three still photographs made by Dr. Schindler from a videotape.
[3] See also La. Const., art. X, § 1(B).
[4] Mr. Evangelist was charged pre-termination with violations of failing to adhere to the law, including simple battery, the use of unauthorized force, and professionalism. All of these charges were sustained by the departmental hearing. An additional charge of violation of truthfulness was added to the letter by Supt. Riley. The Civil Service Commission rejected this additional charge, and the police department has not appealed.
[5] The other discipline imposed in the letter was 60-day suspension for the sustained violation of truthfulness and 10-day suspension for the sustained violation of professionalism. These periods were credited against the period of time he had served on his emergency suspension pending the departmental termination hearing.
[6] There is no issue that if Mr. Evangelist used unauthorized force on Mr. Davis that such misconduct would impair the efficient operation of the service.
[7] We are not including the Rule 2 MORAL CONDUCT, 3. Truthfulness charge because it is not before us on this appeal.
[8] Rule IX treats disciplinary actions. Section 1 treats maintaining standards of service. Paragraph 1.1, which was quoted in full in the charging letter, provides: "1.1 When an employee in the classified service is unable or unwilling to perform the duties of his/her position in a satisfactory manner, or has committed any act to the prejudice of the service, or has omitted to perform any act it was his/her duty to perform, or otherwise has become subject to corrective action, the appointing authority shall take action warranted by the circumstances to maintain the standards of effective service. The action may include one or more of the following: (1) removal from the service. (2) involuntary retirement. (3) reduction in pay within the salary range for the employee's classification, subject to the provisions of Rule IV, Section 8.(4) demotion to any position of a lower classification that the employee is deemed by the appointing authority and the Director to be competent to fill, accompanied by a reduction in pay, which is within the salary range for the lower classification, subject to the provisions of Rule IV, Section 8.(5) suspension without pay not exceeding one hundred twenty (120) calendar days. (6) fine."
[9] The transcripts of testimony were not depositions; they were from the testimony given by these witnesses at the criminal trial of Mr. Evangelist conducted in the district court.
[10] This video is not in evidence in this court. In the video in evidence, it is not disputed that it is Officer Schilling, not Mr. Evangelist, who appears to be striking Mr. Davis in the head area.
[11] This video is not in evidence in this court.
[12] This video is not in evidence in this court.
[13] Sgt. Gay, the "lead investigator" for PIB, was not present at the disciplinary hearing (Hearing Transcript, p. 125).
[14] Mr. Davis testified that he was interviewed by two federal officers, in addition to three NOPD investigators, a few days after the incident (Hearing Transcript, p. 38, lines 17-20; p. 39). Moreover, Davis appeared not to know what NOPD officer did what. He did not know which officer, i.e. Schilling or Evangelist, was dead. He stated he had never seen videotape of the incident on advice of his attorney.
[15] The referee characterized Davis' behavior at the hearing as "volatile and inappropriate."
[16] The referee refused to accept Sgt. Harris as an expert witness, but did allow him to testify about the NOPD training practices on the use of force.
[17] Report, p. 4.
[18] This video is not in evidence in this court.
[19] This video is not in evidence in this court. Although Supt. Riley mentioned audio, and counsel questioned witnesses, including Mr. Evangelist, referring to audio accompanying a videotape, audio (which Mr. Evangelist testified he could not understand and had not heard during the incident) was not included in the record.
[20] Dr. Schindler referred in his testimony to the three still photographs which he had made from the video, at the request of counsel. He did not identify the video from which the photographs were made.
[21] Maj. Najolia testified as an expert on police and force training at the criminal trial on behalf of Evangelist. The transcript of Najolia's trial testimony was submitted at the Commission Hearing and made part of the record.
[22] The brief video segment is the only imaging on the entire disc, and the audio portion of the disc is completely empty. Although in the hearing, counsel and the referee make reference to audio in the questioning of witnesses, the questions and references by the witnesses to audio without its being in evidence are not properly before this court for our review.
[23] Current jurisprudence suggests that the decision-making authority of a referee of the New Orleans civil service commission, as contrasted with the state civil service commission, has not been squarely addressed. See La. Const. Article X, § 12(B) as contrasted with § 12(A); also see, McGee v. Sewerage & Water Bd. of New Orleans, 396 So.2d 430, 432 (La.App. 4th Cir. 1981) ("For the purposes of appellate review we consider the report as advisory to the Commission and in no other light."), which preceded the amendments to the constitution which expressly authorized the appointment of referees by the respective commissions, and Morgan v. Chief Administrative Officer, 455 So.2d 1242, 1244 (La.App. 4th Cir. 1984), which applied the post-amendment article, ("a hearing examiner is appointed `to take testimony and has no decisional authority.' [citations omitted]"). But see, Blappert v. Dept. of Police, 94-1284 (La.App. 4 Cir. 12/15/94), 647 So.2d 1339, 1342 ("The factual findings of the referee will not be set aside unless they are manifestly erroneous.") Our review of the record evidence in this case coincides with that of the report of the referee.
[24] The Commission's decision also references an audio portion on the tape it reviewed. The video in evidence, as we previously noted, has no audio.
[25] A person does have a right to resist an unlawful arrest. See, White v. Morris, 345 So.2d 461 (La. 1977); State v. McCoy, 546 So.2d 240 (La.App. 2 Cir.1989).
[26] However, the Commission's decision interprets Sgt. Gay as viewing a videotape showing Evangelist "without sufficient justification, punching Mr. Davis in the head area and using his knee while he was on the ground surrounded by four officers." (emphasis added to stress the difference in the alleged blowsfrom torso to head).
[27] The untruthfulness charge was a final embellishment/fillip added by Supt. Riley to the conclusions of his staff's hearing. It was rejected by both the referee and the Commission and was not appealed to this court.
[1] Robert Davis testified that he did not view the video of the incident.
[2] Emphasis in original.
[3] The Commission noted that the pedestrian's statement is hearsay, but that it was in the record without objection, and that had there been an objection, it would likely still be admissible as an "excited utterance" or "present sense impression" pursuant to La. C.E. art. 803(1)(2). The Commission noted that the statement was given limited weight in its determination.
[4] Ms. Calvo testified that a laceration was "more than an abrasion. . . . the skin is actually open."
[5] Again, it is noted that the Civil Service Commission's opinion describes the evidence as a "videotape"; the video recording of the incident in evidence with this Court is a DVD. As the majority notes, Sgt. Gay testified that the videotape he examined in connection with his testimony originated from WDSU, Channel 6, in New Orleans. Additionally, Richard J. Richtofen, Jr., representing the Department of Police at the December 6, 2007 hearing, noted with regard to viewing the video recording of the incident, "I've just placed in the player a VHS tape." However, other testimony by Mr. Richtofen references more than one CD being played on a DVD player during Sgt. Gay's testimony at the December 2007 hearing.
[6] As the majority notes, Supt. Riley testified that he viewed several videos in connection with the instant case, one of which originated from CNN and included audio.
[1] Davis testified that the FBI officer forced him to the ground and placed him in a chokehold.
[2] Mr. Evangelist was charged pre-termination with violations of failing to adhere to the law, including simple battery, the use of unauthorized force, and professionalism. All of these charges were sustained by the departmental hearing. An additional charge of violation of truthfulness was added to the letter by Supt. Riley. The Civil Service Commission rejected this additional charge, and the police department has not appealed.
[3] The other discipline imposed in the letter was 60-day suspension for the sustained violation of truthfulness and 10-day suspension for the sustained violation of professionalism. These periods were credited against the period of time he had served on his emergency suspension pending the departmental termination hearing.
[4] There is no issue that if Mr. Evangelist used unauthorized force on Mr. Davis that such misconduct would impair the efficient operation of the service.
[5] Current jurisprudence suggests that the decision-making authority of a referee of the New Orleans civil service commission, as contrasted with the state civil service commission, has not been squarely addressed. See La. Const. Article X, § 12(B) as contrasted with § 12(A); also see, McGee v. Sewerage & Water Bd. of New Orleans, 396 So.2d 430, 432 (La.App. 4th Cir.1981) ("For the purposes of appellate review we consider the report as advisory to the Commission and in no other light."), which preceded the amendments to the constitution which expressly authorized the appointment of referees by the respective commissions, and Morgan v. Chief Administrative Office, 455 So.2d 1242, 1244 (La.App. 4th Cir. 1984), which applied the post-amendment article, ("a hearing examiner is appointed 'to take testimony and has no decisional authority.' [citations omitted]"). But see, Blappert v. Dept. of Police, 94-1284 (La.App. 4 Cir. 12/15/94), 647 So.2d 1339, 1342 ("The factual findings of the referee will not be set aside unless they are manifestly erroneous.") Our review of the record evidence in this case coincides with that of the report of the referee.
[1] Notably, the sentence immediately following the reference to Evangelist's strikes Mr. Davis' the torso reads: "You were also issued Municipal Summons # 896033 for Simple Battery of Mr. Robert Davis." The subsequent paragraph reads as follows:

To afford you an opportunity to present facts in mitigation or to explain your conduct, a hearing was held before Deputy Superintendent Steven B. Nicholas of the Operations Bureau, on December 21, 2005. At the hearing you offered nothing which would tend to mitigate, justify, or explain your behavior as heretofore outlined.
[2] Other courts have noted the expectation of professionalism from police officers as holding officers to a higher standard of conduct than ordinary citizens. Thompson v. City of Appleton, 366 N.W.2d 326, 329 (Minn.App. 1985)("A high standard of conduct is expected of police officers."); City of Minneapolis v. Moe, 450 N.W.2d 367, 370 (Minn.App. 1990)("The image of integrity and trust is essential to the performance of a police officer's duties.")

As the majority acknowledges, the Truthfulness charge was subsequently dropped.
[3] Civil Service Rules have been promulgated to protect workers from unwarranted punishment or retribution by their employer. See Marziale v. Department of Police, p. 13, XXXX-XXXX (La.App. 4 Cir. 11/8/06), 944 So.2d 760, 768. The protection of civil service employees is only against firing (or other discipline) without cause. Gibson v. Dept. of Police, (La. App. 4 Cir. 1/13/10) 30 So.3d 1032 (citing La. Const. art. X, § 12; Cornelius v. Dept. of Police, XXXX-XXXX, p. 8 (La.App. 4 Cir. 3/19/08), 981 So.2d 720, 724).
[4] Emphasis in original.
[5] The Commission noted that the pedestrian's statement is hearsay, but that it was in the record without objection, and that had there been an objection, it would likely still be admissible as an "excited utterance" or "present sense impression" pursuant to La. C.E. art. 803(1)(2). The Commission noted that the statement was given limited weight in its determination.
[6] The majority's opinion describes Mr. Davis "clutch[ing] the iron grillwork on a storefront to resist being handcuffed." This writer finds that such a conclusion is not necessarily supported by the record. As the Commission recognized in its opinion, Mr. Davis testified that he did not intend to resist being handcuffed. Moreover, the Commission noted that, although Appellant denied that Mr. Davis offered to turn over in order to be handcuffed, "after a portion of the videotape was replayed at the hearing it became clear from its audio that Mr. Davis did [offer to turn over to be handcuffed] while he was constrained on the pavement."
[7] Ms. Calvo testified that a laceration is "more than an abrasion ... .the skin is actually open."
[8] The majority states that it is undisputed that it was the FBI agents' actions, and not Appellant's actions, which caused any of Mr. Davis' bleeding. This writer finds that such a conclusion is not supported by the record.
[9] The majority quotes extensively from Kerry Najolia's testimony regarding which areas of the body are appropriate to strike when subduing an arrestee. Upon reviewing Mr. Najolia's testimony in conjunction with the videotape, the Commission explicitly found that "[c]ontrary to the assumption made by Mr. Najolia, Appellant and Officer Schilling were not striking `soft tissue' areas of the lower body." (emphasis added).
[10] Evangelist v. Department of Police, XXXX-XXXX p. 14-18 (La.App. 4 Cir. 9/16/09), 32 So.3d 815, 2009 WL 2960707 (Belsome, J., dissenting).